620 So.2d 557 (1993)
AMERICAN SAND AND GRAVEL COMPANY and Mississippi Commission on Environmental Quality
v.
Joseph TATUM and Mary Tatum.
No. 90-CC-1258.
Supreme Court of Mississippi.
June 17, 1993.
John A. Crawford, O. Kendall Moore, John C. Henegan, Butler Snow O'Mara Stevens & Cannada, Ernest O. Spencer III, Spencer Tyra Crecink Marine & McKnight, Jayne L. Buttross, Jackson, for appellant.
Erik M. Lowrey, Hattiesburg, for appellee.
William L. Smith, Brunini Grantham Grower & Hewes, W. Bruce McKinley, David W. Mockbee, Phelps Dunbar, Jackson, for amicus curiae.
EN BANC.

ON PETITION FOR REHEARING
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION
On petition for rehearing, the original opinion of the Court is withdrawn and this opinion substituted therefor.
Joseph ("Chip") and Mary Tatum live in a secluded home located approximately 50 feet from the Bouie River in Forrest County, Mississippi. On September 18, 1988, they filed a petition with the Bureau of Geology of the Mississippi Department of *558 Environmental Quality ("DEQ")[1] to have a portion of the river and adjacent land  approximately 25 acres  declared unsuitable for mining sand and gravel. One month later, American Sand and Gravel Company ("American Sand") applied for a permit to mine sand and gravel from the acreage included in the Tatums' petition.
On April 12, 1989  in the Board of Supervisors Room at the Chancery Court Building in Hattiesburg  the Mississippi Commission on Environmental Quality[2] held a consolidated public hearing on both the Tatums' petition and American Sand's permit application. The hearing lasted five days.
About a month later, DEQ met in Jackson in executive session. At the conclusion of the session, DEQ announced that it had approved American Sand's application and denied the Tatums' petition.[3] Later, DEQ issued its written order.
The Tatums appealed to the Forrest County Chancery Court. Chancellor Sebe Dale Jr. held a hearing and conducted a de novo review. The chancellor reversed on numerous bases: (1) DEQ failed to support its order with substantial evidence; (2) DEQ failed to give proper notice to Illinois Central Gulf Railroad, whose property would be affected by the proposed mining; (3) DEQ failed to comply with the law that requires the Soil and Water Conservation Districts to comment on proposed mining; (4) DEQ's order lacked factual specificity and accuracy; and (5) DEQ violated the "Open Meetings Act" by discussing and denying the Tatums' petition and American Sand's application in executive session.
American Sand and DEQ appealed, and the Tatums cross-appealed. This Court affirms.

II. ANALYSIS OF ISSUES

A. Issue: Whether the Commission's Order Was Supported By Substantial Evidence?

1. Parties' Contentions
As discussed, the chancellor reversed DEQ's order on numerous bases. Through this first issue, American Sand and DEQ (hereinafter collectively referred to as "American Sand") question the first of these bases. That is, American Sand contends that the chancellor erroneously found that DEQ failed to support its order with substantial evidence. The Tatums, of course, disagree.
All parties discuss the evidence which allegedly supports their respective contentions. This evidence will be analyzed in a later section of this opinion.

2. Relevant Law

(a) Statutes, Rules and Regulations
Pursuant to statutory law, DEQ is "responsible for conserving, managing, developing and protecting the natural resources of the State of Mississippi." Miss. Code Ann. § 49-2-7 (Supp. 1991). More specifically, DEQ is responsible for administering the "Surface and Reclamation Law."[4]Id. § 53-7-19 (1972). The legislature enacted this law to:
(a) Provide for the regulation and control of surface mining so as to minimize its injurious effects by requiring proper reclamation of surface-mined lands;
(b) Establish a regulatory system of permits and reclamation standards, supplemented *559 by the knowledge, expertise and concerns of mining operators, landowners and the general public which is designed to achieve an acceptable, workable balance between the economic necessities of developing our natural resources and the public interest in protecting our birthright of natural beauty and a pristine environment; and
(c) Establish a regulatory system of uniform standards and procedures to govern the mining and reclamation of land, accepting the proposition that varied types of mining, varied types of materials being mined and varied geographical and ecological areas of this state may require variations in methods of surface mining and reclamation; provided, however, that any variation shall be designed to restore the affected area to a useful, productive and beneficial purpose.
Miss. Code Ann. § 53-7-3(2) (Supp. 1991).
In accordance with the preceding statutory mandate, DEQ adopted substantive and procedural rules and regulations to help in the administration of the "Surface and Reclamation Law." Id. §§ 49-2-9(b) & 53-7-11. These rules and regulations are known as the "Mississippi Surface Mining and Reclamation Rules and Regulations" (hereinafter "MSMR").
The MSMR applies to any individual or entity which engages or proposes to engage in surface mining operations. See MSMR Rule 200(A). The individual or entity which proposes to mine a designated area must apply for a permit. Id. at Rule 204. Under MSMR Rule 211(B), DEQ "shall" deny the permit application if: (1) the area which is proposed to be mined is deemed "unsuitable"; (2) the proposed mining will cause pollution of any water or air; or (3) the proposed mining will "endanger the health and safety of the public or will create imminent environmental harm." See Miss. Code Ann. § 53-7-41 (1972). MSMR Rule 401 is more specific:
Areas will be designated as unsuitable for surface mining when [DEQ] determines that operations on such lands will:
(1) result in significant damage to important areas of historic, cultural, or archaeological value or to important natural systems;
(2) affect renewable resource lands resulting in a substantial loss or reduction of long-range productivity of water supply or food or fiber products, such lands to include aquifers and aquifer recharge areas;
(3) be located in areas of unstable geological formations and may reasonably be expected to endanger life and property;
(4) damage ecologically sensitive areas;
(5) significantly and adversely affect any national park, national monument, national historic landmark, property listed on the national register of historic places, national forest, national wilderness area, national wildlife refuge, national wild or scenic river area, state park, state wildlife refuge, state forest, recorded state historical landmark, state historic site, state archaeological landmark, or city or county park; or
(6) endanger any public road, public building, cemetery, school, church or similar structure or existing dwelling outside the permit area.
See also Miss. Code Ann. § 53-7-49 (Supp. 1991).
The permit application may also be denied if the required reclamation plan[5] is deemed infeasible or inadequate. See MSMR Rules 211(B)(1) & 401(7); Miss. Code Ann. § 53-7-41(a) (1972). This reclamation plan must meet the standards meticulously delineated under regulatory and statutory law. These standards are too voluminous to recite; for brevity's sake, see MSMR Rule 750(B) and Miss. Code Ann. §§ 53-7-31 & 53-7-35 (1972).

*560 (b) Standard of Review

DEQ concluded that American Sand's permit application complied with all relevant statutes, rules, and regulations discussed or cited in the preceding section. Thus, DEQ issued an order through which it approved the application and denied the Tatums' petition.
This Court's review on appeal is limited in scope:
Assuming the overall process comports with the constitution, we have no authority to interfere unless one or more of the rulings at issue is (1) beyond the Board's legal power, (2) violates some constitutional right of the complaining party, (3) is arbitrary or capricious, or (4) is not supported by substantial evidence.
McGowan v. Mississippi State Oil & Gas Bd., 604 So.2d 312, 317 (Miss. 1992) (citing numerous cases). Moreover, "[a]s the[se standards] partake of law and not fact, our review on final appeal is de novo." Id. (citing Mississippi State Dep't of Health v. Southwest Mississippi Regional Medical Center, 580 So.2d 1238, 1240 (Miss. 1991)).

3. Review of the Evidence

(a)
This Court has thoroughly reviewed the record which comprises: (1) a lengthy transcript of five days of testimony; (2) three types of photographic evidence  a three-minute videotape, seventy-eight still photographs, and an aerial photograph; and (3) numerous miscellaneous exhibits  such as motions, responses to motions, maps, correspondence, and land deeds and leases. Application of relevant regulatory and statutory law to this evidence leads this Court to the conclusion that DEQ erred in approving American Sand's application to mine the portion of the Bouie River and adjacent property cited in the Tatums' petition. Restated, the chancellor correctly found that DEQ's order lacked requisite evidentiary support. It doesn't take a factfinder to conclude, as the chancellor aptly concluded, that DEQ's order is replete with inaccurate facts and unsubstantiated conclusions.
If one goes beyond the inaccurate and conclusory statements of DEQ's order and considers the scant information provided by American Sand in its permit application, one will quickly notice noncompliance with many of the informational requirements of Miss. Code Ann. § 53-7-27 (1972). For example, § 53-7-27 dictates that the permit application "shall contain" information regarding "the type and method of operation, the engineering techniques, and the equipment which is proposed to be used, including mining schedules, the nature and expected amount of overburden to be removed, the depth of excavations, a description of the affected area and permit area, the anticipated hydrologic consequences of the mining operation," and so forth. American Sand, however, failed to explain in its application  or during the hearing  the hydrologic consequences of the mining operation, the engineering techniques, and the nature and expected amount of overburden to be removed. The answers which American Sand did provide in the application were generally one- or two-word answers without any substantiation or explanation.
In addition, statutory law demands detailed information regarding "[t]he condition of the land to be covered by the permit prior to any mining, including ... the capability of the land ... to support a variety of uses, giving consideration to soil and foundation characteristics, topography and vegetative cover." Statutory law demands information regarding the "capacity of the land to support its anticipated use following reclamation, including a discussion of the capacity of the reclaimed land to support alternative uses." Finally, but not lastly, statutory law demands a "description of how the proposed postmining land condition is to be achieved and the necessary support activities that may be needed to achieve the condition." See generally Miss. Code Ann. §§ 53-7-31(1)(b)-(d) (1972). Such required information is not found in either the application or the transcript of the hearing.
With regard to American Sand's proposed reclamation plan, question C(4) of the application asked for an explanation. *561 American Sand simply answered "lake." This answer or explanation not only fails to meet the informational requirements of Miss. Code Ann. § 53-7-31 (1972) and MSMR § 7, it also contradicts American Sand's testimony provided during the hearing. For example, Robert Meyers Jr., an engineer hired by American Sand for purposes of consultation, testified that a lake would not be formed; rather, "a widening of the river, I think would be more correct." Compare Meyers' testimony with the unsubstantiated conclusion found in DEQ's order: "[T]he mining operation will change the condition of the river from a riverine environment into a lake." In actuality, the evidence leaves one with the impression that a lifeless 65-foot pit will be created by American Sand  not a pristine lake with sandy beaches and people engaged in recreational activities. See, e.g., Rec.Vol. III, at 98-118 (testimony of Kenneth Rich of the Department of Wildlife Conservation and the Bureau of Fisheries and Wildlife); id. at 54 (testimony of William Gilliland, Administrator of DEQ's Mining and Reclamation Section). Indeed, Richard Speed, director of American Sand's operations, testified that the "lake and sand beaches" will not be left to the public for recreational use.
Finally, and most notable, is the fact that American Sand failed to provide DEQ with a topographical description of the required surface drainage plan.

(b)
In sum, the record is devoid of sufficient evidence  scientific, geological, or hydrological studies, surveys, data, or otherwise  to support DEQ's conclusion that the portion of the Bouie River cited in the Tatums' petition is suitable for mining sand and gravel. Conversely, the record is devoid of sufficient evidence to support DEQ's rejection of the Tatums' contention that the proposed mining operation will "be located in [an area] of unstable geological formations"; that it will cause erosion; that it "may reasonably be expected to endanger life and property"; and that it will "damage [an] ecologically sensitive area." See MSMR 100 & 401(A).
At most, American Sand utters tenuous words of assurance: "[I]t is our intention to not ... affect any area within the 300-foot radius around any dwelling." As for American Sand's reclamation plan  there is none  unless you characterize the following vague statement as a "plan": "Our proposal is to leave a large lake with sand beaches ... [to] be formed naturally."
Based on the foregoing, this Court affirms the chancellor's finding that DEQ's decision is not supported by substantial evidence.

B. Issue: Whether the Chancellor Erred in Deciding That Proper Notice Was Not Given to the Illinois Central Gulf Railroad?

1.
On September 19, 1988, DEQ informed the Tatums and American Sand that it would hold a consolidated public hearing on the petition and permit application. Statutory law provides that DEQ "shall give thirty (30) days' notice of the date, time, and place of any such hearing" to "the owners of record of all surface areas in the permit area and within five hundred (500) feet thereof." See Miss. Code Ann. § 53-7-45 (Supp. 1991). This notice shall also include the subject matter of the hearing. MSMR 904 also requires that notice be given: "Before [DEQ] can hold a procedural public hearing, [DEQ] shall give thirty (30) days' notice of the date, time, place, and purpose of any such hearings... by first class mail to the owners of record of all surface areas in the permit area and within five hundred (500) feet thereof." But DEQ ignored the foregoing statutory and regulatory dictates.
DEQ admitted that it had failed to give notice to one of the "owners of record of [a] surface area[] in the permit area and within five hundred (500) feet thereof." This "owner of record" is the Illinois Central Gulf Railroad.
QUESTION: Did you send notice to the Illinois Central Railroad?
WILLIAM GILLILAND: No, sir.
QUESTION: Why not?
GILLILAND: We should have, sir.

*562 QUESTION: But you didn't.
GILLILAND: But we did not. I see that they are property owners within the 500 feet. We should have.
Rec.Vol. III, at 68-69.
The chancellor reversed DEQ's order, in part, on the basis of DEQ's admitted failure to provide the Railroad with notice. American Sand contends that the chancellor erred because Rick Speed, operations officer for American Sand, testified accordingly:
QUESTION: Has ICG [Illinois Central Gulf Railroad] been in contact with American Sand with reference to the proposed operation?
SPEED: It's my understanding they have, yes, sir.
QUESTION: They are not an opponent in this case, however, are they?
SPEED: No, they are not.
Rec.Vol. VI, at 586. Thus, American Sand explains, Speed's testimony proves that the Railroad "somehow" received actual notice  notwithstanding DEQ's failure to officially provide the Railroad with legal notice.

2.
This Court rejects American Sand's contention. DEQ admitted that it had failed to comply with both statutory and regulatory notice requirements. And the record is wholly devoid of substantiation for American Sand's unpersuasive contention that  in view of Speed's testimony  the Railroad probably knew about the date, time, place, and subject matter of the hearing. The record is simply devoid of any evidence to support Speed's "understanding" that the Railroad received notice.
In view of DEQ's failure to provide the Railroad with proper notice, this Court affirms on this issue.

C. Issue: Whether the Chancellor Erred in Deciding That DEQ Failed to Comply with the Law that Requires the Soil and Water Conservation Districts to Comment on the Proposed Mining?

1.
Miss. Code Ann. § 53-7-29 provides in part:
[DEQ] shall immediately submit copies, excluding all confidential information, of the permit application or notice of intent to the state soil and water conservation commission [and numerous other state agencies] whose jurisdictions the commission feels the particular mining operation may affect and to any person who requests the notification thereof upon payment of a reasonable fee established by the Commission.
Another statutory provision, § 53-7-33, expressly dictates that:
The commissioners of the soil and water conservation districts affected shall submit written comments, recommendations and evaluations of such reclamation plans to the commission within thirty (30) days after filing of such plan from the operator as required by section 53-7-27. Such comments, recommendations and evaluations shall become a part of the record.
See also id. § 53-7-29 (Soil and Water Conservation Districts "shall [also] review the permit application and notice of intent and submit, within thirty (30) days of receipt of the application, such comments, recommendations and evaluations as the agency deems necessary and proper based only upon the effect of the proposed operation on matters within the agency's jurisdiction. Such comments shall include an enumeration of permits or licenses required under the agency's jurisdiction.").
MSMR Rule 207 similarly requires:
Upon receipt of a notice of intent or permit application, the commissioners of the soil and water conservation district(s) in which any part of the land to be mined is located shall review the reclamation plan that is part of the application.
Within thirty (30) days after the filing of the notice of intent or permit application by the operator, the district(s) shall make written comments, recommendations, and evaluations of the plan and submit them to the Mississippi State Soil and Water Conservation Commission. *563 The Commission will then send the comments to the [DEQ]. Such comments and recommendations shall be made a part of the record and one (1) copy shall be furnished to the operator by the [DEQ].

2.
In the case sub judice, William Gilliland (Administrator of DEQ's Mining and Reclamation Section) testified that his staff mailed notices to the Soil and Water Conservation Districts, but that DEQ did not receive "comments, recommendations and evaluations" from them regarding American Sand's proposed mining and reclamation plan. The record, however, is devoid of any documentary evidence to support Gilliland's testimony that notices were mailed to the Districts.
The chancellor reversed DEQ's order, in part, on the basis that:
It is readily apparent that the Legislature intended that such comments, recommendations and evaluations, accomplished by an agency of the state government totally detached from any alliance with or obligation to any party to the proceeding, an agency peculiarly fitted and qualified to make evaluation of the proposed reclamation plans, must be made before the commission and considered by it in making its findings and order. It is simply insufficient for the Commission here to plead that it is without power to compel compliance on the part of the soil and water commission  the Legislature has mandated it, and has placed upon this Commission the obligation to obtain compliance. In this instance this mandated evidence was not before the Commission.
Rec.Vol. II, at 178-79. American Sand contends that the chancellor erred because statutory provisions do not require the Districts to submit "comments, recommendations and evaluations." In other words, the Districts may  as opposed to must  submit "comments, recommendations and evaluations." Thus, the Districts' failure to submit "comments, recommendations and evaluations" should be deemed regrettable and not fatal. The Tatums, of course, concur in the chancellor's decision.

3.
Construction of statutory and regulatory provisions quoted above is necessary to determine whether the chancellor erred. Research revealed no published case in which these provisions have been construed. This notwithstanding, a reasonable construction of both statutory and regulatory provisions lends credence to the chancellor's construction. Both provisions use the word "shall"  which this Court has construed to mean "mandatory" (unlike the word "may" which has been construed to mean "permissive"). See, e.g., Murphy v. State, 253 Miss. 644, 178 So.2d 692 (1965); see also Rec.Vol. III, at 28 (where Gilliland testified that he believes the soil and water districts are "required to file comments").
Requiring the Soil and Water Conservation Districts to submit written comments, recommendations and evaluations of mining permit applications is certainly in the public's best interest; after all, the legislature created the Districts and other state agencies in order to
provide for the conservation of the water and soil resources of this state, and for the control and prevention of soil erosion, and thereby to preserve natural resources, control floods, prevent impairment of [structures], assist in maintaining the navigability of rivers and harbors, preserve wildlife, ... protect public lands, and protect and promote the health, safety, prosperity, and general welfare of the people of this state.
Miss. Code Ann. § 69-27-3(d) (1972). If these agencies feel that the proposed mining would have no adverse affects, then they should say so. Of course, it's entirely possible that the reason the Districts and other agencies failed to submit their "comments, recommendations and evaluations" is because they received no notice or copies of American Sand's application as required under statutory and regulatory provisions. As noted, the record is devoid of any documentary evidence to support Gilliland's testimony that his staff mailed notices.
*564 With the foregoing said, this Court affirms on this issue.

D. Issue: Whether the Chancellor Erred in Complaining About the Lack of Factual Specificity and Accuracy in DEQ's Order?

In reversing DEQ's order, the chancellor complained that it (DEQ's order) "lack[ed] the requisite specificity [and accuracy] in several particulars." In other words, DEQ should have supported its approval of American Sand's permit application and denial of the Tatums' petition with at least some findings of fact.
DEQ and American Sand contend that the chancellor's complaint was unjustified in view of case law which does not require specificity or "detailed findings of fact." The Tatums disagree.
This Court concludes that the chancellor's complaint is justified and therefore affirms on this issue.

E. Issue: Whether the Commission Violated the "Open Meetings Act?"

In executive session, DEQ considered the Tatums' petition and American Sand's permit application. After about 25 minutes, DEQ announced that it had denied the Tatums' petition and approved American Sand's application. The Tatums, in their appeal to the chancery court, charged that DEQ's decisionmaking behind closed doors had violated the "Open Meetings Act." See Miss. Code Ann. § 25-41-1 (1972). Specifically, the Tatums contended that DEQ violated this Act because it had failed to provide them with notice of the meeting and it had failed to "even give this cause the courtesy of being on the agenda." The chancellor agreed and cited DEQ's violation as one of the bases upon which to invalidate DEQ's decision. American Sand appealed.
This Court has reviewed this and other remaining issues and deems them moot or devoid of merit. A published discussion of them is unnecessary.

III. CONCLUSION
An old American Indian proverb poignantly preaches that "the frog does not drink up the pond in which he lives."[6] Designated state agencies must heed such wisdom and be more conscientious in fulfilling their duty to protect and preserve Mississippi's most precious natural resource.[7] This requires strict adherence to, and application of, relevant statutory and regulatory laws.
With the foregoing in mind, this Court affirms the chancellor's decision.
AFFIRMED.
HAWKINS, C.J., DAN M. LEE, P.J., and PITTMAN, BANKS, McRAE, ROBERTS and SMITH, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] At the time when the Tatums filed their petition, the Mississippi Department of Environmental Quality was known as the Mississippi Department of Natural Resources. See Miss. Code Ann. § 49-2-6 (Supp. 1992).
[2] The Commission is composed of seven governor-appointed members  one of whom acts as chairman. They serve a term of seven years. Miss. Code Ann. §§ 49-2-2 & 49-2-5 (1972 as amended). The "powers and duties" of the Commission and DEQ are distinctive; however, for the sake of convenience, both entities will be referred to in this opinion collectively as "DEQ." Compare id. §§ 49-2-5, 49-2-6 & 49-2-9 (Commission's "powers and responsibilities), with id. §§ 49-2-7 & 49-2-13 (DEQ's "powers and responsibilities).
[3] Notably, DEQ had never denied a permit application. Rec.Vol. III, at 34.
[4] More specifically, "DEQ's Bureau of Geology administers the Surface Mining and Reclamation Law." See MSMR Rule 100(A); see also Miss. Code Ann. § 53-5-1 (1972).
[5] MSMR Rule 101(19) and Miss. Code Ann. § 53-7-5(m) define "reclamation" as "[w]ork necessary to restore an area of land affected by surface mining to a useful, productive, and beneficial purpose, the entire process being to restore the land to a useful, productive, and beneficial purpose, suitable and amenable to surrounding land and consistent with local governmental conditions in accordance with the standards set forth in Section 11 and other provisions of the [MSMR]."
[6] Quoted in D. Zwick & M. Benstock, Water Wasteland 3 (1971).
[7] See id. at xiii ("Water is the most precious, limited natural resource we have in this country."); see also Bergin, Water Resource Restoration and Preservation Efforts in Florida: Legal and Geopolitical Implications, in Florida's Water Future: Crisis or Opportunity? 41 (1987) (Florida State University College of Law Policy Studies Clinic Monograph Series).